IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 5:15-CT-3055-FL

| | |
|---|---|
| KENNETH GIBSON, | ) |
| Plaintiff, | ) ) ) |
| v. | ) ) |
| DONNIE HARRISON, OFFICER K. MEYER, DR. UMESI, MAJOR P. WILLIAMS, ASSISTANT DIRECTOR HIGDON, D. BOWEN, and WAKE COUNTY SHERIFF DEPARTMENT. | ) ORDER ) ) ) ) ) ) |
| Defendants.[1] | ) |

This matter is before the court on defendants' motion for summary judgment (DE 56) and plaintiff's letter motion (DE 79). The issues raised have been fully briefed and are ripe for adjudication. For the following reasons, this court grants defendants' motion and plaintiff's motion.

## STATEMENT OF THE CASE

On March 4, 2015, plaintiff, a state inmate, filed this civil rights action, pro se, pursuant to 42 U.S.C. § 1983. In his verified complaint, plaintiff named the following as defendants: Donnie Harrison ("Harrison"), Officer K. Meyer ("Meyer"), Dr. Umesi ("Dr. Umesi"), Major P. Williams ("Williams"), Assistant Director Higdon ("Higdon"), D. Bowen ("Bowen"), State of North Carolina, Wake County Sheriff Department, and Wake County Detention Center.

On October 23, 2015, this court conducted a frivolity review pursuant to 28 U.S.C. § 1915.

---

[1] The court has constructively amended the caption of this order to reflect the dismissal of two previously-named defendants: State of North Carolina and Wake County Detention Center.

At that time, this court dismissed the Wake County Detention Center and the State of North Carolina for failure to state a claim against them. Plaintiff was allowed to proceed against the remaining defendants.

On November 30, 2015, plaintiff filed a motion to appoint counsel, which was denied. On December 10, 2015, plaintiff filed a motion for discovery. Plaintiff's motion for discovery was denied as premature. On February 3, 2016, plaintiff filed another motion to appoint counsel, and the motion was denied. On March 1, 2016, this court entered a case management order.

On April 20, 2016, plaintiff filed a motion for an investigator and a motion to change or amend prayer for relief. On May 20, 2016, plaintiff's motion seeking an investigator was denied. On that same day, plaintiff's motion to change or amend his prayer for relief was granted.

On June 8, 2016, plaintiff filed a motion for investigator, motion for warrants, and a motion to appoint counsel. The motions were denied. On August 29, 2016, plaintiff filed a motion to request all information discovery. This court construed the filing as a motion to compel discovery and granted the motion.

On September 20, 2016, defendants filed the instant motion for summary judgment, memorandum in support (DE 57), and statement of material facts (DE 58). In support of their motion to summary judgment, defendants filed the following: defendant Higdon's affidavit (DE 56-2); defendant Meyer's affidavit (DE 56-3); Heidi Steinbeck's ("Steinbeck) affidavit (DE 56-4); defendant Dr. Umesi's affidavit (DE 56-5); April 17, 2012, incident report (DE 56-6); July 27, 2012, incident report (DE 56-7); November 3, 2012, incident report (DE 56-8); defendant Higdon's notes and letter (DE 56-9); jail inspector documents (DE 56-10); N.C. Gen. Stat. § 20-135.2A (DE 56-11); J. Evans's witness statement (DE 56-12); Inmate Richard Hinton's ("Inmate Hinton") disciplinary

report (DE 56-13); plaintiff's safekeeping request (DE 56-14); and plaintiff's safekeeping order (DE 56-15). On May 26, 2017, defendants were directed to re-file the memorandum in support of their motion for summary judgment, defendant Dr. Umesi's affidavit, and plaintiff's applicable medical records. On June 16, 2017, defendants re-filed a revised memorandum in support (DE 77), plaintiff's medical records (DE 77-1) and defendant Dr. Umesi's revised affidavit (DE 77-2).

In the meantime, on October 12, 2016, plaintiff filed a motion for additional discovery. On October 20, 2016, plaintiff filed a motion for copies. Both motions were denied.

On November 17, 2016, plaintiff filed a response to defendant's motion for summary judgment, which is supported by the following: plaintiff's verified complaint (DE 1), a response to defendants' memorandum of law (DE 73-1), a response to defendants' statement of material facts (DE 73-2), a response to defendants' appendix (DE 73-3), a response to Steinbeck's affidavit (DE 73-4), a response to defendant Dr. Umesi's affidavit (DE 73-5), a cover letter (DE 73-6), and exhibits (DE 73-7). On June 16, 2017, plaintiff filed a supplemental response to defendants' motion for summary judgment. That same day, plaintiff filed his letter motion seeking the return of documents.

## STATEMENT OF THE FACTS

Except as otherwise noted below, the facts viewed in the light most favorable to plaintiff may be summarized as follows:

A. First Incident

On April 17, 2012, between 4:45 p.m. and 5:30 p.m., plaintiff and three other inmates[2] were

---

[2] The three other inmates were Eddie Taylor, Kyle Ragland, and Fabian Williams. (See Mot. Summ. J. (DE 56) Ex. 3 ¶ 19).

being transported from court back to the Wake County Detention Center. (See Compl. (DE 1) at 4;[3] Mot. Summ. J. (DE 56) Ex. 3 ¶ 5, Ex. 6). Defendant Meyer was driving the detention transport van "as in Nascar."[4] (See Compl. (DE 1) at 5). In particular, Defendant Meyer was driving careless and reckless and exceeding the posted speed limit by 20 miles per hour. (See id.) The inmates attempted to stop defendant Meyer, but they were unsuccessful. (See id.)

Defendant Meyer was hitting the gas real hard and then hitting the brake equally hard. See id. The inmates were not in seat belts.[5] (See id.) Many of the seat belts in the van were non-operational, and the inmates could not access the operational seat belts. (See id.) All of a sudden, the van hit "something" with a great deal of force.[6] (See id.)

Defendant Meyer recalls one inmate saying he "may" be hurt. (See Mot. Summ. J. (DE 56) Ex. 3 ¶ 16). Defendant Meyer went the short distance to the Wake County Detention Center, which could provide any necessary medical assistance. (See id.) Plaintiff recalls defendant Meyer laughing and telling jokes all the way to the Wake County Detention Center.[7] (See Compl. (DE 1) at 5). Moreover, defendant Meyer did not show guilt or remorse for what he had done. (See id.)

---

[3] Unless otherwise specified, page numbers provided in citations to documents in the record specify the page number designated on the document by the court's case management / electronic case filing (ECF) system, rather than numbers or marks on the underlying document(s).

[4] According to defendants, defendant Meyer was driving with due caution at the time of the incident so that he was able to avoid a collision. (See Mot. Summ. J. (DE 56-3) ¶ 14).

[5] Citing N.C. Gen. Stat. § 20-135.2A, defendants assert that inmates are not required to wear seat belts. (See Mot. Summ. J. (DE 56) Ex. 3 ¶ 9). Moreover, defendants contend that there did not appear to be any malfunctioning seat belts in the transport van. (Id.)

[6] Defendants contend that defendant Meyer was at the intersection of S. Salisbury Street and W. Davie Street when a civilian vehicle unexpectedly slammed on its brakes in the middle of the intersection. (See id. ¶¶ 11-12). Defendants further contend that Officer Meyer had to stop abruptly to avoid a collision, yet he never made contact with the other vehicle. (Id. ¶ 12.)

[7] Defendants deny that defendant Meyer was laughing at the inmates. (See id. Ex. 13 ¶ 17).

Defendant Meyer did not want to "write up" the accident in an incident report, but the sergeant made him do so. (See id.) Defendant Meyer filled out a Wake County Jail Incident Report for each inmate in the van. (See Mot. Summ. J. (DE 56) Ex. 3 ¶ 20).

Plaintiff sustained injuries. (See Compl. (DE 1) at 5). Some of the injuries went away, but most did not. See id. Plaintiff asked to be moved downstairs or to a medical pod over the next few months, but all of his requests were denied. (See id.)

Plaintiff heard from both officers and inmates that defendant Meyer was saying that those inmates involved in the van accident were "faking." (See Compl. (DE 1) at 6). Prison officials got rid of the old van and moved defendant Meyer to "armed transport" with a car, so that he would "stop messing up or injuring people." (See id.)

Plaintiff suffered minor injuries to his head, and on April 17, 2012, he was evaluated by Nurse Kivuit. (See Rev. Mem. Supp. (DE 77) Ex. 2 ¶ 4; Mot. Summ. J. (DE 56) Ex. 6). Nurse Kivuit discovered a scratch on plaintiff's left hand, and she ordered Motrin 800mg TID for 7 days. (See Mot. Summ. J. (DE 56) Ex. 6; Rev. Mem. Supp. (DE 77) Ex. 2 ¶ 4).

The next day, April 18, 2012, plaintiff returned to the jail medical clinic complaining of headaches and soreness to his right shoulder. (See Rev. Mem. Supp. (DE 77) Ex. 2 ¶ 5). Plaintiff was seen by PA Bethea and given Flexeril 10mg BID for two weeks, and plaintiff was directed to continue with the Motrin as needed. (See id.) On April 25, 2012, plaintiff filed a medical sick call complaining of migraines and eye issues and made a request for stronger medication due to "[c]ar accident a week ago." (See id. ¶ 6).

On April 27, 2012, plaintiff refused a medical sick call and treatment. (See id.) During May

and June 2012, plaintiff was seen by jail medical staff for complaints on multiple occasions, and his medications were adjusted as necessary. (See id. ¶¶ 7-10).

On both July 3, 2012 and July 5, 2012, plaintiff refused to respond to and attend two sick call requests he submitted. (See id. ¶ 11). On July 18, 2012, plaintiff reported migraines, blood in his stool, back pain, left-sided numbness, and a decrease in weight.[8] (See id. ¶ 12).

B. Second Incident

On July 27, 2012, between 10:00 a.m. and 11:30 a.m.[9], plaintiff experienced a muscle spasm, which was an issue he had been having since the April 17, 2012, van accident. (See Compl. (DE 1) ¶ IV at 6). Plaintiff also felt dizzy. See id. Plaintiff tried holding onto the handrail but could not keep holding on.[10] (See id.) Plaintiff fell and landed on his neck. (See id.) Plaintiff could have been paralyzed or even killed. (See id.)

Nurses Jordan and Harris responded immediately. (See Rev. Mem. Supp. (DE 77) Ex. 2 ¶ 13; Mot. Summ. J. (DE 56) Ex. 7). Captain Alford and Officer Wingfield also promptly responded. (See Mot. Summ. J. (DE 56) Ex. 7). Emergency Medical Services ("EMS") transported plaintiff to Wake Med Hospital Emergency Center for treatment. (See Compl. (DE 1) ¶ IV at 6; Rev. Mem. Supp. (DE 77) Ex. 2 ¶ 13). Wake Orthopedics determined that plaintiff had fractured his left ankle

---

[8] According to defendants, plaintiff was thought to have "wanted" to lose weight, and he decreased his weight from 355 lbs. on February 12, 2012, down to 288 lbs. on July 18, 2012. (See Rev. Mem. Supp. (DE 77) Ex. 2 ¶ 12). In August, plaintiff requested a special diet in an effort to lose even more weight. (See id.)

[9] Defendants represent that the second incident occurred at 11:55 a.m. (See Mot. Summ. J. (DE 56) Ex. 7 at 1).

[10] The handrails in the new dorm were four times wider and two times longer. (See Compl. (DE 1) ¶ IV at 6).

and had five to six broken bones.[11]  (See Compl. (DE 1) ¶ IV at 6).

On July 28, 2012, plaintiff was seen by PA Bethea in the jail medical clinic. (See Mem. Supp. (DE 77) Ex. 2 ¶ 14).  A splint was in place on plaintiff's fractured left ankle, and no new complaints were noted.  (Id.)  In August of 2012, plaintiff continued to be seen both at the jail's medical clinic and by outside providers.  (See id. ¶¶ 15-16).

On August 28, 2012, plaintiff submitted a request for a liquid diet as a special medical diet. (See id. ¶ 16).  On September 4, 2012, the request was denied by PA Bethea because she determined that the request did not meet the requirements for a special medical diet. (See id.)

On or about Friday, September 7, 2012, defendant Higdon, the Assistant Director of the Wake County Detention Services,[12] was provided with a registered letter that Director Butler had received from Louise Williams ("Williams"), dated August 28, 2012, concerning her grandson, plaintiff, who was then being housed in the Wake County Jail. (See Mot. Summ. J. (DE 56) Ex. 2 ¶ 4).

On Monday, September 10, 2012, Defendant Higdon planned to speak with plaintiff, but before he could do so, defendant Higdon received an "inmate request form" requesting to speak with defendant Higdon. (See id. ¶ 5).  Defendant Higdon met with plaintiff, along with Administrator Williams, to discuss plaintiff's numerous medical complaints and his grandmother's concerns. (See id. Ex. 2 ¶ 5).  At the meeting, plaintiff explained that he had refused to go to sick calls on different occasions after he had requested medical attention because he believed that the medical staff was

---

[11] According to defendants, Wake Med Hospital and Wake Orthopedics diagnosed the fracture. (See Rev. Mem. Supp. (DE 77) Ex. 2 ¶ 13).

[12] Defendant Higdon served in this capacity at all times complained of in this action. (See Mot. Summ. J. (DE 56) Ex. 2 ¶ 2).

7

not taking his complaints seriously. (See id. ¶ 12). Defendant Higdon advised plaintiff not to refuse medical treatment and to follow the directions provided by the medical providers. (See id.) Defendant Higdon concluded plaintiff's medical needs were being addressed in an "excellent" manner and that plaintiff would be best served by following the advice from the medical providers while he was in the custody of the Wake County Jail. (See id. ¶ 13).

Plaintiff continued to request to be moved to the first floor. (See Compl. (DE 1) at 5-6). The second incident would never have occurred if plaintiff had been moved as requested. (See id. at 6)

C.   Third Incident

On November 2, 2012, between 10:00 a.m. and 11:00 a.m., plaintiff was involved in a verbal altercation with Inmate Hinton, a fellow inmate.[13] (See Compl. (DE 1) ¶ IV at 7). In particular, one of the gang members plaintiff was housed with moved plaintiff's belongings and took his chair. (See id.) When plaintiff asked if he could have the chair back, the "thug" said, "This my man's seat now." (See id.) Plaintiff went to get another seat, but the "thug" said, "You can't get this [chair] either." (See id.)

Plaintiff pushed the seat. (See id.) The "thug" asked, "How would you like it if someone pushed you?" (See id.) The "thug" pushed on plaintiff's broken leg. (See id.) Plaintiff heard a "pop" noise. (See id.) An officer who was present advised plaintiff that "people like [Inmate Hinton] prey on the weak. (See id.) You should press charges."[14] (See id.)

---

[13] According to defendants, the third incident occurred on November 3, 2012, at 9:15 p.m. (See Mot. Summ. J. (DE 56) Ex. 8).

[14] Defendants assert that Officer A. Terry was present during the verbal altercation that evolved into pushing and shoving. (See id.) Inmate Hinton gripped plaintiff's left crutch and raised it in a manner that caused plaintiff to lose his balance. (See id.) Inmate Hinton then proceeded to give a forceful push, which caused plaintiff

8

Plaintiff tried to "press charges," but plaintiff alleges he was denied his "rights."[15] (See id.). On November 6, 2012, Inmate Hinton was found guilty of assault and given 30 days of disciplinary segregation. (See Mot. Summ. J. (DE 56) Ex. 13).

Plaintiff was escorted to medical and seen by the Nurse Sills. (See id. Ex. 8 at 1). Plaintiff complained of pain at a level of five out of a maximum of ten pain scale. (See Rev. Mem. Supp. (DE 77) Ex. 2 ¶ 17). Nurse Sills ordered pain medication, as needed, for up to five days. (See id.) Plaintiff was rehoused to 1E to avoided additional problems in the dorm. (See Mot. Summ. J. (DE 56) Ex. 8 at 1.)

On November 16, 2012, plaintiff was taken to a follow up appointment with Wake Orthopedics. (See Rev. Mem. Supp. (DE 77) ¶ 19). At the appointment, plaintiff was given an "air stirrup splint/weight bearing as tolerated" for his ankle. (Id.)

On December 11, 2012, Director Butler and defendant Higdon received a fax from Chris Wood, a Jail Inspector with the North Carolina Department of Health and Human Services, regarding a grievance filed by plaintiff. (See Mot. Summ. J. (DE 56) Ex. 2 ¶ 14). Plaintiff wrote Wood a six-page letter regarding the April 17, 2012, "van incident" and his medical care. (Id.) Defendant Higdon responded to Inspector Wood in a memo dated September 10, 2012. (Id.)

On January 14, 2013, defendant Higdon received two grievances from plaintiff regarding his medical care. (See id. ¶ 15). Defendant Higdon investigated and concluded that plaintiff's medical needs were being adequately addressed by Wake County Detention Center. (See id.)

On February 18, 2013, plaintiff's grandmother, Williams, came to the Wake County

---

to fall to the floor. (See id.).

[15] Defendants represent that there is no indication that plaintiff attempted to "press charges." (See Stat. Mat. Facts (DE 58) ¶ 59).

9

Detention Center to discuss her grandson's medical needs. (See id, ¶ 16). Defendant Higdon contacted the medical clinic and inquired whether plaintiff could be seen that day because his foot appeared to be swollen. (Id.) Later that same afternoon, plaintiff was seen and received medical care. (See id.)

In February[16], Plaintiff was finally moved to the medical pod. (See Compl. (DE 1) at 7). Plaintiff was only moved there because of punishment. (See id.) The second and third incidents could have been avoided if plaintiff had been properly been in the medical pod from the outset. (See id. at 6)

On March 3, 2013, plaintiff requested to go to "Safekeeping."[17] (Mot. Summ. J. (DE 56) Ex. 14). On March 14, 2013, plaintiff was sent to the North Carolina Department of Public Safety as a Safekeeper under N.C. Gen. Stat. § 162-39. (See id. Ex. 15).

## DISCUSSION

A.  Standard of Review

Summary judgment is appropriate when there exists no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). The party seeking summary judgment bears the initial burden of coming forward and demonstrating an absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the nonmoving party then must affirmatively demonstrate that there exists a genuine issue of material

---

[16] Plaintiff's complaint does not state what year, but it appears from the context to be 2013. (See Compl. (DE 1) at 7).

[17] Plaintiff's request stated, "Can I please go to a prison; any prison as a safe keeper to wait for court! I never go to court. I'm superbly tired of getting hurt or having to be on lockdown for crazy/no reason! Please, I beg you; ask whoever you need to I'm ready." (See Mot. Summ. J. (DE 56) Ex. 14).

10

fact requiring trial. Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). There is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party. Anderson, 477 U.S. at 250.

B.   Analysis

   1.   Defendants' Motion for Summary Judgment

In their motion for summary judgment, defendants, both in their individual and official capacities, argue that they are entitled to summary judgment because no genuine issue of material fact exists and they are entitled to judgment as a matter of law. (See Mot. Summ. J. (DE 56) at 1). Defendants contend that plaintiff has not and cannot present evidence sufficient to permit reasonable jurors to find in his favor. (See Mem. Supp. (DE 57) at 1). Defendants conclude that summary judgment should be granted in their favor, and all of plaintiff's claims against them should be dismissed. Id.

      a.   Official capacity claims

Defendants argue that plaintiff is not entitled to recover monetary damages against the remaining defendants in their official capacities.[18] (See Mem. Supp. (DE 57) at 9). The Eleventh Amendment prevents a lawsuit in federal court against a State without its consent. U.S. Const. amend XI; Alden v. Maine, 527 U.S. 706, 729 (1999). By the same token, a state officer acting in their official capacity is entitled to Eleventh Amendment immunity. Will v. Michigan Dep't of State Police, 491 U.S. 58, 71 (1989).

As a general rule, governmental immunity protects a municipality and its officers or

---

[18] The remaining defendants are either the elected Sheriff of Wake County, North Carolina or were employees of the Sheriff of Wake County during the relevant time period. (See Mem. Supp. (DE 57) at 1).

employees who are sued in their official capacity for torts committed while performing a governmental function. Sellers v. Rodriquez, 149 N.C. App. 619, 623 (2002). To state a cognizable claim against a government entity and its employees in their official capacities, a plaintiff must allege that there has been a waiver of governmental immunity or otherwise consent to suit. Id.

In this case, a suit against defendants in their official capacities is a suit against North Carolina. There has been no representation that defendants have waived their immunity or otherwise consented to this lawsuit. Therefore, defendants are entitled to summary judgment in their official capacities.

      b.      State law claims

Defendants argue that defendant Harrison, the Sheriff, is an elected public official of Wake County, North Carolina, and both he and his employees are entitled to sovereign governmental immunity with respect to any state law claims in their official capacity for the performance of governmental functions. (See Mem. Law (DE 57) at 10-11). Defendants concede that a North Carolina Sheriff may be sued on his bond, but payment goes only as far as the limits of the bond. (See id. at 11). Defendants argue that in order to sue a Sheriff on his bond, the Sheriff's surety must be joined as a party to the action. Id. Because this was not done in this case, defendants conclude that to the extent any of plaintiff's claims sound in tort law, the claims are barred by sovereign immunity. (See id.)

"Generally, governmental immunity protects a municipality and its officers or employees sued in their official capacity for torts committed while performing a governmental function[.]" Sellers, 149 N.C. App. at 623. A governmental entity, such as a county, can waive its immunity by purchasing liability insurance and thereby subject itself to liability for the tortuous acts of its officers

and employees. Id. When the basis for the waiver is the purchase of a bond, government immunity "is removed only where the surety is joined as a party to the action." Id. at 624.

In this case, defendants concede that defendant Harrison has a $5,000.00 Sheriff's Bond pursuant to N.C. Gen. Stat. § 162-8. (See Mem. Law (DE 57) at 11). However, the Sheriff's surety was not actually joined as a party to this action. Consequently, defendants are entitled to summary judgment on any of plaintiff's claims sounding in state law.

    b.  Wake County Sheriff's Department

Defendants argue that the Wake County Sheriff's Department is entitled to summary judgment for two reasons. (See Mem. Law (DE 57) at 11-12). First, defendants represent that there is no such legal entity as the Wake County Sheriff's Department. (Id. at 11). Second, defendants argue that the Wake County Sheriff's Department is not a proper party to this action because it is not a "person" within the meaning of 42 U.S.C. § 1983. (Id. at 12).

"To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." West v. Atkins, 487 U.S. 42, 48 (1988) (emphasis added); accord 42 U.S.C. § 1983.

In this case, the Wake County Sheriff's Department is not a "person," and therefore, it cannot be held liable under § 1983. See Gardner v. Lenoir Cnty. Sheriff's Office, No. 4:14-CV-66-FL, 2015 WL 3852956, at *6 (E.D.N.C. June 22, 2015) ("A sheriff's department is not a proper defendant in a § 1983 action.") (citing James v. Lancaster Sheriff's Dep't, No. 0:13-210-JFASVH, 2013 WL 3938962, at *1 (D.S.C. July 30, 2013); (Maraia v. Buncombe Cnty. Sheriff's Dep't, No. 1:12cv98, 2012 WL 5336955, at *2 (W.D.N.C. Oct. 2, 2012)). Consequently, this court will enter

summary judgment for the Wake County Sheriff's Department on all of plaintiff's claims.

      c.      Plaintiff's medical needs

Defendants argue that to the extent plaintiff's complaint may be construed as asserting a claim for deliberate indifference to serious medical needs, they are entitled to summary judgment. (See Mem. Law (DE 57) at 12). In particular, defendants contend that plaintiff's allegations must fail because they lack evidentiary support. (See id.)

The Eighth Amendment prohibits the infliction of "cruel and unusual punishments." U.S. Const. amend. VIII; See United States v. Torrez, ___ F.3d ___ , 2017 WL 3687712, at *15 (4th Cir. 2017). "[M]istreatment or nontreatment must be capable of characterization as 'cruel and unusual punishment' in order to present a colorable claim under § 1983." Russell v. Sheffer, 528 F.2d 318, 318 (4th Cir. 1975) (per curiam). An Eighth Amendment claim based on the failure to provide proper medical care has both an objective and a subjective component. Iko v. Shreve, 535 F.3d 225, 241 (4th Cir. 2008). "The plaintiff must demonstrate that the [prison] officers acted with 'deliberate indifference' (subjective) to the inmate's 'serious medical needs' (objective)." Estelle v. Gamble, 429 U.S. 97, 104 (1976).

"Deliberate indifference" involves more than ordinary negligence and requires that a prison official "knows of and disregards an excessive risk to inmate health or safety." Farmer v. Brennan, 511 U.S. 825, 837 (1994). A prison official must actually know of and disregard a "serious" medical need. Shakka v. Smith, 71 F.3d 162, 166 (4th Cir. 1995) (quoting Hudson v. McMillian, 503 U.S. 1, 9 (1992)). A medical need is serious when it "has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Iko, at 241 (citation omitted).

14

When determining whether a prison official has been deliberately indifferent to a prisoner's serious medical needs, a court can rely on medical records concerning examination and treatment of the inmate. See Bennette v. Reed, 534 F. Supp. 83, 87 (E.D.N.C. 1981), aff'd, 676 F.2d 690 (4th Cir. 1982); see also Dulany v. Carnahan, 132 F.3d 1234, 1240 (8th Cir. 1997) ("In the face of medical records indicating that treatment was provided and physician affidavits indicating that the care provided was adequate, an inmate cannot create a question of fact by merely stating that she did not feel she received adequate treatment.").

In this case, this court's review of defendant Dr. Umesi's affidavit and plaintiff's medical records establish that plaintiff received constitutionally adequate medical care. (See Rev. Mem. Supp. (DE 77) Exs. 1, 2). In fact, the evidence before this court reveals that plaintiff was seen on <u>numerous</u> occasions by various medical providers, both at the jail medical clinic and by outside medical providers.[19] (See id.) This included treatment by Wake Orthopedics, a specialty clinic. (See id.) In sum, because there is no evidence in the record that defendants knew of and disregarded a serious medical need, plaintiff has not established an Eighth Amendment violation. See Gregg v. Ham, 678 F.3d 333, 341 n.7 (4th Cir. 2012) ("To prevail under qualified immunity, [defendant] has to show either that there was no constitutional violation or that the right violated was not clearly established."). Accordingly, defendants' motion for summary judgment, as it relates to plaintiff's medical needs, is granted.

2.   Plaintiff's letter motion

---

[19] Plaintiff was sent in the jail medical clinic and evaluated by a medical provider on each of the followings dates: March 6, 2008, March 20, 2008, April 22, 2010, February 19, 2011, March 30, 2012, April 18, 2012, May 6, 2012, May 22, 2012, June 13, 2012, July 28, 2012, August 8, 2012, November 5, 2012, January 17, 2013, February 18, 2013, February 20, 2013. February 26, 2013. March 5, 2013, March 13, 2013. (See Rev. Mem. Supp. (DE 77) Ex. 2 ¶ 25). These dates do not include nurse sick calls or those times when plaintiff refused the clinic. (Id.)

15

The second and final motion before this court is plaintiff's letter motion (DE 79), in which he seeks return of the exhibits he purportedly filed in conjunction with a 2016 motion for summary judgment. (Id. at 1). Plaintiff suggests that these were the only copies he had of original exhibits. (Id.) Because plaintiff has not filed a motion for summary judgment, this court will construe plaintiff's motion as a request for the return of evidence filed in opposition to defendants' 2016 motion for summary judgment.

A pro se litigant assumes responsibility for properly maintaining his legal records. The court generally does not provide a pro se litigant with copies of the docket sheet or any documents filed on the record in a case until he submits payment of the copying costs assessed by the clerk of court in accordance with the District Court Miscellaneous Fee Schedule. See 28 U.S.C. § 1914 note (2017). Currently, the cost of photocopying is $.50 per page. See 28 U.S.C. § 1914 n.4. Accordingly, a plaintiff seeking copies of court documents must transmit the request directly to the clerk of court and remit the requisite payment by cash, check or credit card. Under present circumstances, the court finds good cause to allow plaintiff's letter motion for return of exhibits, in this single instance, and the clerk is DIRECTED to mail plaintiff copies of DE 73 and 78. Plaintiff is cautioned, however, that to the extent he seeks further copies of any or all filings in this matter, he may submit his request directly to the clerk of court and remit the requisite payment by cash, check or credit card.

## CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment (DE 56) and plaintiff's letter motion (DE 79) are GRANTED. The clerk is DIRECTED to close this case.

SO ORDERED, this the 18th day of September, 2017.

_____
LOUISE W. FLANAGAN
United States District Judge